UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 20-CR-293 |
| -v- | ) | |
| | ) | Honorable Manish S. Shah |
| RAHUL SHAH, | ) | |
| | ) | |
| Defendant. | ) | |

**RAHUL SHAH'S SENTENCING SUBMISSION
AND OBJECTIONS TO THE PSR**

Dated: December 15, 2025

STEPTOE LLP

Christopher S. Niewoehner
227 West Monroe Street, Ste. 4700
Chicago, IL 60606
Telephone: (312) 577-1300
cniewoehner@steptoe.com

Drew C. Harris (*pro hac vice*)
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900
dcharris@steptoe.com

Caroline A. Covington (*pro hac vice*)
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-6269
ccovington@steptoe.com

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

I.    RAHUL SHAH'S PERSONAL BACKGROUND AND CHARACTER...........................................2

    A.    Background.........................................................................................................2

    B.    Rahul Is a Committed Family Man and a Supportive Member of His Community .....................4

    C.    Rahul Built Katalyst from the Ground Up...........................................................9

    D.    The Sudhir Valia Partnership Directly Caused Katalyst to Default .........................................12

    E.    Rahul's Life Has Been Upended by Katalyst's Collapse and by this Case ..............................16

II.    THE COURT SHOULD IMPOSE ONLY THE MANDATORY SENTENCE OF TWO YEARS AND TWO DAYS' IMPRISONMENT ......................................................................................18

    A.    Guidelines........................................................................................................18

        1.    Loss ........................................................................................................18

        2.    Additional Specific Offense Characteristics......................................................22

    B.    Section 3553(a) Factors .................................................................................24

        1.    The Nature and Circumstances of the Offense Support a Below-Guidelines Sentence .....25

        2.    Rahul's Extraordinary Personal History and Characteristics Support a Below-Guidelines Sentence...............................................................................30

        3.    Rahul Suffers a Panoply of Medical Issues that BOP Will Not Be Able to Adequately Manage ...............................................................................31

        4.    Deterrence Goals Are Still Met by a Below-Guidelines Sentence ...................................32

III.    FINE AMOUNT CAPPED BY *APPRENDI* ..................................................................35

IV.    RESTITUTION .................................................................................................................37

    A.    The Court Should Not Find Impose Restitution for Losses Rahul Did Not Cause ...................37

    B.    The Court Should Not Impose Restitution on Amounts Beyond the Principal .........................39

    C.    The Court Cannot Impose Restitution Pursuant to *Apprendi* .....................................42

V.    OBJECTIONS TO PRESENTENCING REPORT AND SENTENCING RECOMMENDATION .43

CONCLUSION...................................................................................................................45

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Apprendi v. New Jersey*,
530 U.S. 466 (2000) ................................................................................................. 35, 36, 42

*Ellingburg v. United States*,
No. 24-482 ........................................................................................................................... 42

*Gall v. United States*,
552 U.S. 38 (2007) ............................................................................................................... 24

*Hester v. United States*,
586 U.S. 1104 (2019) ........................................................................................................... 42

*Lagos v. United States*,
584 U.S. 577 (2018) ............................................................................................................. 41

*Robers v. United States*,
572 U.S. 639 (2014) ............................................................................................................. 39

*Simon v. United States*,
361 F. Supp. 2d 35 (E.D.N.Y. 2005) .................................................................................... 34

*Southern Union Co. v. United States*,
567 U.S. 343 (2012) ........................................................................................................ 36, 42

*United States v. Arvanitis*,
902 F.2d 489 (7th Cir. 1990) ................................................................................................ 40

*United States v. Barker*,
80 F.4th 827 (7th Cir. 2023) ................................................................................................. 19

*United States v. Betts*,
99 F.4th 1048, 1061 (7th Cir. 2024) ................................................................................ 37, 40

*United States v. Buchanan*,
Nos. 22¬3301/3697, 2023 WL 5352223 (6th Cir. Aug. 21, 2023) ...................................... 40

*United States v. Burns*,
843 F.3d 679 (7th Cir. 2016) ........................................................................................... 19, 21

*United States v. Cabrera*,
567 F.Supp.2d 271 (D. Mass. 2008) ..................................................................................... 34

*United States v. Carruth*,
418 F.3d 900 (8th Cir. 2005) (Bye, J., dissenting) .............................................................. 42

*United States v. Chemetco, Inc.*,
274 F.3d 1154 (7th Cir. 2001) .............................................................................................. 36

*United States v. Darway*,
   255 Fed. App'x 68 (6th Cir. 2007) .......................................................................... 34

*United States v. Hamilton*,
   323 Fed. App'x 27 (2d Cir. 2009) ........................................................................... 34

*United States v. Higdon*,
   531 F.3d 561 (7th Cir. 2008) ................................................................................... 22

*United States v. Hill*,
   645 F.3d 900 (7th Cir. 2011) ................................................................................... 24

*United States v. Isaacson*,
   752 F.3d 1291 (11th Cir. 2014) ............................................................................... 20

*United States v. Johnson*,
   471 F.3d 764 (7th Cir. 2006) ................................................................................... 24

*United States v. Jordan*,
   435 F.3d 693 (7th Cir. 2006) ................................................................................... 24

*United States v. LaGrou Distribution Sys.*,
   466 F.3d 585 (7th Cir. 2006) ................................................................................... 36

*United States v. Leahy*,
   438 F.3d 328 (3d Cir. 2006) (en banc) .................................................................... 42

*United States v. Lloyd*,
   807 F.3d 1128 (9th Cir. 2015) ................................................................................. 21

*United States v. Lonich*,
   23 F.4th 881 (9th Cir. 2022) .................................................................................... 20

*United States v. McCormack*,
   152 F.4th 428 (3d Cir. 2025) ................................................................................... 40

*United States v. Mitchell*,
   876 F.2d 1178 (5th Cir. 1989) ........................................................................... 40, 41

*United States v. Moore*,
   52 F.4th 697 (7th Cir. 2022) ............................................................................... 18, 22

*United States v. Nellum*,
   2005 WL 300073 (N.D. Ind. Feb. 3, 2005) ............................................................ 34

*United States v. Newton*,
   76 F.4th 662 (7th Cir. 2023) .................................................................................... 18

*United States v. Powell*,
   576 F.3d 482 (7th Cir., 2009) .................................................................................. 31

*United States v. Printz*,
594 F. App'x 883 (7th Cir. 2015) ............................................................................ 42

*United States v. Rothwell*,
387 F.3d 579 (6th Cir. 2004) ................................................................................... 20

*United States v. Rutley*,
482 Fed. Appx. 175 (7th Cir. 2012) ........................................................................ 41

*United States v. Scott*,
405 F.3d 615 (7th Cir. 2005) ................................................................................... 40

*United States v. Sharp*,
927 F.2d 170 (4th Cir. 1991) ................................................................................... 40

*United States v. Simon*,
No. 3:10-CR-00056(01)RM, 2011 WL 924264 (N.D. Ind. Mar. 14, 2011) ........... 23

*United States v. Treadwell*,
593 F.3d 990 (9th Cir. 2010), *overruled on other grounds by United States v. Miller*,
953 F.3d 1095 (9th Cir. 2020) ................................................................................. 21

*United States v. Urbina*,
2009 WL 565485 (E.D. Wis. Mar. 5, 2009) ............................................................ 34

*United States v. Ward*,
814 F. Supp. 23 (E.D. Va. 1993) ............................................................................. 34

*United States v. Warner*,
792 F.3d 847 (7th Cir. 2015) ................................................................................... 24

*United States v. Wolfe*,
701 F.3d 1206 (7th Cir. 2012) ................................................................................. 42

*United States v. Young*,
590 F.3d 467 (7th Cir. 2010) ................................................................................... 24

*Yes Bank Ltd. v. Katalyst Tech., Inc.*,
No. 2025L002650 (Cir. Ct. Cook Cty., Feb. 24, 2025) ........................................... 15

**Statutes**

18 U.S.C. § 1028A(b)(2) and (4) ........................................................................................ 25

18 U.S.C. § 1257(b)(2) ...................................................................................................... 37

18 U.S.C. § 1957(b)(2) ...................................................................................................... 35

18 U.S.C. § 3147................................................................................................................. 25

18 U.S.C. § 3553................................................................................................................. 24

18 U.S.C. § 3553(a) ...................................................................................................................*passim*

18 U.S.C. § 3571(b)(1) and (3) .............................................................................................. 35, 37

18 U.S.C. § 3571(d) ................................................................................................................. 35, 37

18 U.S.C. § 3663A ............................................................................................................. 37, 39, 41

18 U.S.C. § 3663A(a)(2) ................................................................................................................ 37

18 U.S.C. § 3663A(b)(1) ................................................................................................................ 40

18 U.S.C. § 3663A(b)(2) ................................................................................................................ 40

U.S.S.G. § 1B1.3 ........................................................................................................................... 21

U.S.S.G. § 2B1.1 .....................................................................................................................*passim*

U.S.S.G. § 3C1.1 ........................................................................................................................... 23

U.S.S.G. § 5E1.1 ........................................................................................................................... 41

U.S.S.G. § 6A1.3(a) ...................................................................................................................... 18

## Other Authorities

Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of
    Recent Research* 1-2 (1999) ................................................................................................... 33

David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White
    Collar Crimes*, 33 Criminology 587 (1995) ......................................................................... 34

Indian Ministry of Corporate Affairs,
    https://www.mca.gov.in/content/mca/global/en/mca/master-data/MDS.html ..................... 38

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006)........................... 33

Nicole B. Godfrey, *Decades of Indifference and Failures in Accountability in the
    Provision of Medical Care in Federal Prisons*, 25 Nev. L.J. 755, 759 (2025) .................................. 32

Shankar Acharya, *India: Crisis, Reforms and Growth in the Nineties* (2022), available at
    https://kingcenter.stanford.edu/publications/working-paper/india-crisis-reforms-and-
    growth-nineties ....................................................................................................................... 3

*Trump Administration*, Prisonology (Jan. 23, 2025),
    https://www.prisonology.com/blog/sweeping-changes-for-the-bureau-of-prisons-
    under-the-trump-administration ........................................................................................... 32

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative
    Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ..................... 33, 34

**INTRODUCTION**

Rahul Shah, by and through the undersigned counsel, submits this Sentencing Submission, along with the attached letters and other exhibits.

There is no question that Rahul Shah will suffer severe consequences as a result of this matter—he already has. Rahul has suffered physically and mentally since he was first arrested in August 2020. Rahul has been detained in India and separated from his family for months because of his vindictive former business partner, Sudhir Valia. Rahul faces financial ruin, as the company that he spent his career building has been taken away from him, and somehow he alone must bear the financial responsibility for money that Katalyst received that Valia still has and refuses to pay. Both the Guidelines calculations that Rahul faces and the sentence recommended in the PSR would, especially in light of his health conditions, including diabetes and asthma, condemn him to spend the remainder of his life in prison. Even the minimum of two years and two days' imprisonment that Rahul faces will be especially difficult for him because of his health issues.

This is stunning for someone whose life has been devoted to his family and working in a company that has helped thousands of people—many from low-income households—find jobs, both in the United States and India. Rahul has been an important pillar within his family and within the many communities in which he has resided. When his father fell ill and then passed away at only 45 years of age, Rahul returned home from college to shepherd his family, and the family business, through those dark times. When Rahul's sister-in-law, fleeing an abusive marriage, and niece needed a place to stay, Rahul welcomed them into his home on a long-term basis, becoming so close with his niece that she still calls him "dad." When a Katalyst employee with no family in the United States was hospitalized, Rahul canceled a major family vacation to look after him. Throughout his life, Rahul has consistently put others' needs before his own, exhibiting a unique generosity of spirit.

1

In the face of all this, Rahul will try to do what is right. He recognizes and accepts the jury's findings. He will do his best to repay the banks' losses, even though the equity in Katalyst that could pay those debts is now under Valia's control. Rahul is willing to give up his 33% personal ownership stake in Katalyst to the banks—wiping out the last 25 years of his life's work—as the best he can do.

Rahul asks this Court to take the entirety of his life, not just the events portrayed in the trial, to fashion a sentence that is sufficient, but not greater than necessary, as required by 18 U.S.C. § 3553(a).

## I. RAHUL SHAH'S PERSONAL BACKGROUND AND CHARACTER

### A. Background

Rahul Shah was raised in Pune, India, by his parents and members of his extended family who lived nearby. PSR ¶ 83; 6/20 Tr. 49:20-23.[1] Rahul's father ran an industrial hardware distribution business, and his parents emphasized to him and his older brother, Chirag, the importance of education and hard work. *Id.*; *see also* Ex. A (Letter of Chirag Shah) ("Rahul and I were raised in a close-knit family in Pune, India, grounded in the values of respect, truth, and service to others.").

Rahul looked up to his brother and followed in his footsteps in many ways. Chirag participated in the Rotary Youth Exchange program with a Mormon family in Mesa, Arizona, and Rahul later stayed with the same family. PSR ¶ 84; 6/20 Tr. 50:1-5. Chirag attended Brigham Young University, studying engineering, and Rahul followed suit, enrolling in the undergraduate chemical engineering program there. PSR ¶ 84; 6/20 Tr. 50:8-13.

---

[1] All citations to the trial transcript refer to Rahul's testimony.

During Rahul's first year at BYU, tragedy struck when his father grew ill and then passed away at the young age of 45. *Id.* ¶ 85. His father's death was a shock in more ways than one. In addition to taking an emotional toll on Rahul, Rahul's father's death had tremendous financial implications for his family during what was already a tumultuous time in India, amidst the balance of payments crisis,[2] with banks attempting to recall loans made to the Shah family's business. "After the death of his father[,] he had to grow up very fast." Ex. B (Letter or Taranum Chaudry).

Rahul rose to the occasion, immediately returning home to help. As his brother, Chirag, explains, "At only twenty-two, Rahul set aside his own dreams to take responsibility for the family and its businesses during one of India's worst economic crises. Through determination and courage, he stabilized the companies, paid every lender and creditor in full, and protected our family's reputation. When stability returned, rather than profit for himself, Rahul chose to withdraw from the family business so our mother could join us in the United States, where she could be cared for." Ex. A (Letter of Chirag Shah).

Through those difficult years, there was a bright spot: During his time at BYU, Rahul met Shobha Shagle. 6/20 Tr. 50:20-22. In her letter to the Court, Shobha speaks glowingly of the Rahul she knew at BYU, explaining that he is still the same man today. Rahul "was the first to offer to help any international student arriving to the university, whether picking them up from the airport, providing short term funds or being there for them in their times of need." Ex. C (Letter of Shobha Shah). As Shobha writes, "This value system has been carried throughout his life and continues to do so even today despite the multitude of challenges he faces both mentally, and Healthwise. The Rahul I know would give the last dollar he has to help someone in need." *Id.*

---

[2] *See* Shankar Acharya, *India: Crisis, Reforms and Growth in the Nineties* (2022), available at https://kingcenter.stanford.edu/publications/working-paper/india-crisis-reforms-and-growth-nineties.

Despite considerable pressure from her family to study home economics and enter into an arranged marriage, Shobha struck out on her own, pursuing a doctorate in statistics in the United States and marrying Rahul. After several years in a long-distance relationship, with Shobha in the United States and Rahul supporting his family in India, they married in 1994 and settled down in the United States, moving to Skokie and then Evanston so that Shobha could pursue a fellowship at Northwestern University. PSR ¶ 85. They began their life together in a modest and inexpensive apartment. Ex. C (Letter of Shobha Shah).

Rahul and Shobha have one son, Naman, whom they raised together in Chicagoland. *Id.* ¶ 86. Now 28, Naman is pursuing his MBA at Columbia University in New York. *Id.* Naman speaks lovingly of his childhood, and his dad's central role in it, in his letter to the Court. Ex. D (Letter of Naman Shah). Naman describes the time his dad spent with him even when his work was busy, including the "countless hours" Rahul would spend taking him to practice sports, and the values Rahul shared with Naman, including "the spirit of kindness, accepting people as they are," and "helping marginalized individuals." *Id.*

As discussed below, beyond serving as loving, supportive parents to Naman, Rahul and Shobha have played an essential role in raising their niece, Neha.

### B. Rahul Is a Committed Family Man and a Supportive Member of His Community

Rahul's deeds prove that he is a fundamentally kind person, who is generous with others and always willing to help. Rahul offers to those around him a "quiet reliability and devotion to family," which "have earned him the admiration and gratitude of everyone who knows him." Ex. E (Letter of Trideep Shah). His "empathy and commitment to helping others reflect a deep moral strength and sense of duty." *Id.*

4

Perhaps nothing better illustrates these truths than Rahul's act of welcoming with open arms his sister-in-law, Asha Shagle, and his niece, Neha Shagle, during a profoundly troubling time in their lives. Asha testified, under subpoena, at trial, but then proactively furnished a letter in support of Rahul, attached as Exhibit F. In her letter, Asha described Rahul's "compassion and generosity," describing "how Shobha and Rahul sheltered me in their home for a couple years, when I left California to get away from an abusive marriage." Ex. F (Letter of Asha Shagle). At a time when Asha had "tried to end her life," Ex. C (Letter of Shobha Shah), Rahul and Shobha were, as Asha explains in her letter, "instrumental in getting my life back together," with Chicago becoming her home "for nearly twenty years because of them." *Id.* Asha warmly recalled "Rahul's popular saying 'my home and heart is always open'" and described him as "a people's person, committed to family, friends, and to the community." *Id.* As Shobha notes, "Rahul essentially dropped everything to ensure Asha and her daughter Neha were protected, safe and made sure they were comfortable in our home in Skokie. Rahul raised Neha [beginning when she] was 18 months old when she moved as his own child, [and] made sure there was no difference in care, affection, love, opportunities between our son Naman. Neha . . . has never met her biological father, [and] still calls and considers [Rahul] 'Dad.'" Ex. C (Letter of Shobha Shah).

In his letter to the Court, Rahul's brother speaks about Rahul's commitment to taking care of others, explaining that he "has supported relatives through medical and financial crises, paid for children's education, and quietly stepped in wherever help was needed." Ex. A (Letter of Chirag Shah); *see also* Ex. E (Letter of Trideep Shah) (explaining that Rahul has "supported extended family members in tangible ways, from assisting with college expenses to providing care for my father [Rahul's uncle] when health challenges arose"). Echoing Shobha, Chirag notes that even now, after everything that Rahul has been through, "Rahul's moral compass remains unchanged.

5

Those who know him—family, employees, and friends—see a man guided by empathy and fairness, someone who believes in accountability but also in forgiveness. He has never sought personal enrichment at the expense of others and has lived his life in service to family, work, and community." *Id.*

Throughout their marriage, Rahul has steadfastly supported Shobha's career. They moved to Illinois so that Shobha could pursue her career there; Shobha pursued a fellowship at Northwestern University's Center for Urban Affairs and Policy Research from 1993 through 1995, and thereafter became a research associate and consultant at NU. In 2001, she joined the National Opinion Research Center at the University of Chicago as a survey director, later becoming a research scientist. Rahul fully supported Shobha's career in academia, and she left to manage HR for DSR Management, Katalyst's predecessor, only in 2005, by which time the success of the consulting business was evident.

Outside of his family, Rahul has dedicated significant time and resources to educational, medical, and religious causes. Rahul has mentored numerous Northwestern University students and other community members of Indian origin over the years. He has regularly made significant donations to numerous charitable causes as well:

1. From 2008 through 2020, Rahul and Shobha donated approximately $15,000 to $20,000 per year to Door Step Schools in India, which provides basic education to 3-5 year old children of transient construction workers. These donations have enabled the provision of educational necessities, such as books and writing supplies, to thousands of children. *See* Ex. D (Letter of Naman Shah).

6

2. Rahul and Shobha donated over $100,000 to the construction of a Jain temple in Phoenix, and helped the temple avoid bankruptcy. He and Shobha continue to support Jain and Hindu temples in the Phoenix and Chicagoland areas.

3. Rahul and Shobha support the Inga Foundation program in India, which provides surgical support to children with cleft lip in India.

4. Rahul and Shobha have supported the Ravinia Festival, the Art Institute of Chicago, and various other Chicagoland community and cultural organizations over the past 15 years. 6/24 Tr. 90:12-16.

5. Through Katalyst, Rahul and Shobha supported Culinary Care, an organization that provides meals to families of cancer patients in the Chicagoland area, and provided job training and internships in partnership with Launch U for local low-income children.

In business, too, Rahul has shown generosity in numerous ways. Over the years, as Rahul built Katalyst, he would always say, "We should be the last in line to be paid." Ex. C (Letter of Shobha Shah). As an employer, Rahul was generous, kind, and well-liked: "Rahul made it a priority to hire individuals from underrepresented backgrounds, creating opportunities for those often overlooked by society. Many of his employees have remained with him for over fifteen years, not because of financial rewards, but because of his kindness, mentorship, and personal concern for their wellbeing." Ex. A (Letter of Chirag Shah). He treated his employees as "an extended family" that "we needed to take care of," even canceling a family vacation to India once to help care for an employee who had been hospitalized but had no family in the United States. Ex. D (Letter of Naman Shah).

Prajakta Gandhi, who testified at trial, submitted a letter to the Court based on the almost five years during which she worked directly under Rahul's leadership at Katalyst, during which

time Rahul guided her as she transitioned from Executive Administrator to manager of the Global Marketing & Communications team. Ex. G (Letter of Prajakta Gandhi). In her letter, Prajakta describes how "Mr. Shah consistently demonstrated exceptional leadership qualities underscored by a profound sense of compassion and personal integrity," "always prioritiz[ing] the well-being and personal circumstances of his team members" and treating them "as an extension of his family." *Id.* In one memorable instance, Rahul even offered Ms. Gandhi, who was then pregnant, use of his personal car when hers broke down. *Id.* Others shared similar stories. A letter from Shweta Rohra, another former Katalyst employee who testified at trial, identifies Rahul as "an insightful mentor and dedicated teacher" who paid employees using personal funds after Katalyst, which he no longer controlled, abruptly terminated their employment, and describes the "immense personal support" Rahul and his family provided her, "making them feel like my extended family." Ex. H (Letter of Shweta Rohra). Indeed, Rahul would support his employees to such a great extent that it "sometimes made difficult financial decisions challenging," as when he "didn't have the heart to" lay people off. Ex. I (Letter of Allen Frank).

Similarly, N2N (d/b/a Boardshare) represented a direct effort to enhance educational opportunity in the United States and India. As Shobha explains in her letter, "The reason for creating Boardshare wasn't to enrich our family. Boardshare was [created to] bridge the digital divide in the world and even [today] we have many low-income schools reach out to us to provide units for their classroom." Ex. C (Letter of Shobha Shah). By creating an interactive whiteboard solution that would cost significantly less than the flatscreen-television-based units that were then proliferating in higher-income school districts, Boardshare was able to expand the subset of schools that could afford to furnish teachers with digital whiteboards. Rahul and his family personally invested at least $2-3 million to develop the product, and Boardshare has donated

8

thousands of units to schools in the United States and India. Touchingly, N2N's name is a double entendre, meaning both "end to end" and "Naman to Neha." Ex. D (Letter of Naman Shah).

While Rahul and Shobha have been unable to access their Katalyst shareholdings in India, they "have committed to give away 90% of wealth (assume we get access to these funds)–to the less fortunate in this world. This has been Rahul's guiding principle from day 1." Ex. C (Letter of Shobha Shah). As Shobha explains, "material wealth has never . . . nor will mean anything to us"; the Shah's idea of a fun night out is "going to dinner at Olive Garden and watching movies at the local AMC on Bargain Tuesday ($6). Spending time with our family, kids and being supportive of our community has always been Rahul's way of enjoying the 'good life.'" *Id.* At trial, the government attempted to paint a picture of Rahul as prideful, as a means of explaining his desire to see Katalyst continue to grow. But Rahul explained, "We are fortunate enough to be successful and we wanted to share our success with the community. . . . It's not a question of being proud. It's a responsibility towards the community." 6/24 Tr. 90:3-13.

## C. Rahul Built Katalyst from the Ground Up

As Rahul described on the witness stand, he is a self-made man—one who has managed to balance work and family needs to an admirable degree. When he returned to the United States with Shobha in 1994, he took university-level computer science courses and found a job at a small company, Computer Power Group, where he worked for about two years in the testing department. 6/20 Tr. 52:1-5. Desiring more flexibility to ensure he had sufficient time to focus on raising Naman, Rahul left Computer Power Group in 1996, becoming an independent consultant focused on software quality assurance and testing programs. *Id.* at 52:5-6. In 2000, Rahul stepped back, taking a six-month break to evaluate possible next steps, including the possibility of returning to India. *Id.* at 52:23-53:2.

9

But global events created an unexpected opportunity: when the dot-com bubble burst, many talented software engineers were suddenly out of work and looking to keep busy, even if it meant taking lower compensation for project- or task-based work. *Id.* at 53:9-21. Having developed relationships with various clients over the years, Rahul spotted an opportunity to place experienced software engineers in the United States with his own former clients. *Id.* Thus was born DSR Management, Katalyst's predecessor entity. Rahul funded DSR with his personal savings, using his Skokie basement as an office. *Id.* at 54:1-9. Focusing on the same type of quality assurance work that Rahul had learned through prior experience the company gradually grew, taking in talented young engineers and quality assurance analysts, who would work for such clients as Allstate, the American Red Cross, and large school districts. *Id.* at 55:1-5; *see also* Ex. J (Letter of Ravi Ramnath) (discussing QA project at Allstate in 2001/2002). Rahul invested a lot of time recruiting the right talent to meet DSR's clients' needs, and clients in turn appreciated the quality work that DSR's consultants consistently provided. 6/20 Tr. 55:16-20. Rahul focused on sales and recruiting, and a small team in the United States handled payroll, invoicing, and collections. *Id.* at 58:12-22.

By 2005, DSR had approximately 60 employees and a separate cadre of subcontractors, servicing approximately 15 clients and generating about $9 million in annual revenue. *Id.* at 57:9-11, 58:1-11. DSR expanded to India in 2005, opening a small back office in Pune to provide support services, including the finance functions that had previously been handled by DSR's team in the United States. *Id.* at 56:6-9. In 2010, DSR acquired Leadsoft, a small Indian software company, in part with a $375,000 loan made directly by Rahul to DSR. *Id.* at 61:15-62:23; GX-612. Through the acquisition, Rahul hoped to move DSR up the value chain, from providing staff augmentation services to implementing entire SAP projects. 6/20 Tr. 63:12-25.

10

But the Leadsoft acquisition was only the start.  To really grow in the project-based space, DSR would need more growth capital than Rahul was able to provide himself.  DSR engaged investment bankers in the United States and India to assist with fundraising, and through that process, Rahul was introduced to Sudhir Valia, a wealthy Indian businessman whose brother-in-law, Dilip Shanghvi, founded and helmed Sun Pharmaceuticals.  *Id.* 65:10-66:6.  A group led by Valia ultimately invested in DSR, which had recently rebranded as Katalyst, in March 2013, taking a 50% stake.  *Id.* at 66:9-10; GX-214 at 18.  With that acquisition, Valia's investor group took control over Katalyst's finance, accounting, and banking functions.  *Id.* at 75:10-21.  Following the March 2015 acquisition of Idhasoft, Valia acquired an additional 8% of the Company, bringing their bloc's holdings to 58% and the Shah family's down to 42%.  *Id.* at 78:1-5.  As a result, Valia gained formal control over the Company as well.

Initially, the arrangement with Valia seemed to be working out; and though their relationship was, initially, purely professional, the two developed a nearly familial bond, at least for a time.  PSR ¶ 95.

Under Rahul's management, Katalyst continued to grow for almost a decade, eventually surpassing 1,000 employees on payroll, spread throughout offices all over the globe.  6/20 Tr. 79:17-80:23; DX-647; 6/23 Tr. 7:14-8:17; DX-649A.  As Asha, who lived with Rahul and Shobha for years, noted in her letter of support, Rahul's "professional accomplishments" included "encouraging and creating opportunities for thousands."  Ex. F (Letter of Asha Shagle).  Shobha similarly notes that Rahul is a "builder," adding that as "an entrepreneur, he truly believes that business creates more opportunity for growth and success for all. At Katalyst, he has created 1000's of jobs, provided job opportunities for individual[s] from low-income household in India

11

and uplifted the lives of their families." Ex. C (Letter of Shobha Shah); *see also* Ex. A (Letter of Chirag Shah) ("They employed hundreds of people domestically as well as globally.").

### D. The Sudhir Valia Partnership Directly Caused Katalyst to Default

Beginning in 2014, at Valia's urging, Katalyst's U.S. entity, Katalyst Technologies, Inc. ("KTI"), entered into a series of line-of-credit and loan transactions with the U.S. branches of certain Indian banks. These transactions, which are the principal focus of the instant prosecution, eventually left KTI with an oppressive credit structure. And at every turn, when Rahul attempted to find ways to make the banks whole, Valia blocked Rahul's efforts. Looking back, Rahul "made an error in judgment by" failing to take Shobha's "advice on not taking funds or diluting the equity in Katalyst" and instead "trusting the Valia and Shanghvi family." Ex. C (Letter of Shobha Shah). That decision, though mistaken, was in keeping with, and a product of, Rahul's character: "Rahul Shah has always been eternally optimistic and trusting individual," a good trait that has "also been abused by others" to Rahul's detriment. *Id.*; *see also generally* Ex. M (Letter of Nishant Upadhyay).

From 2014 until the end of 2019, KTI remained current on its interest payments. KTI began falling behind on its payment obligations only in late 2019. *See* GX-321; GX-152. Indeed, as Bank of Baroda representatives pointed out to Rahul shortly after KTI took out the $32 million loan with Yes Bank, the Yes Bank loan—which had been entered into at Valia's insistence—was poorly structured and would result in higher payments by KTI than the prior arrangement with Bank of Baroda, which had been a line of credit. *See* GX-315. This untenable capital structure eventually led KTI to default on its obligations to all three banks with which Katalyst had outstanding loans (Yes Bank, Bank of Baroda, and State Bank of India).

KTI began to fall behind on its loan payments in 2019. That same year, another issue arose: Valia had previously caused Katalyst to make an off-the-books payment of approximately $30,000

to the Cleveland Clinic, and Rahul became aware that the payment was made on behalf of the nephew of a judge in India who had an important matter regarding Sun Pharmaceuticals' tax liability on his docket. Rahul was so concerned about this that he retained DLA Piper, which helped him file an FCPA complaint against Valia with the Department of Justice in December 2019.

Within weeks, Valia seized formal control of Katalyst. On January 31, 2020, Valia called an extraordinary general meeting of Katalyst India shareholders, at which Valia's bloc used its voting power to remove four Katalyst India directors, including Rahul's wife. A fifth director then resigned in protest. DX-150 at 1-2; DX-651 at 25. A few months later, in April 2020, Valia called for another extraordinary general meeting, which was held on June 20, 2020. At that meeting, Valia's bloc stacked Katalyst India's board with Valia loyalists who had extensive ties to Valia's family but who lacked the significant industry experience and other qualifications held by the directors Valia had previously ejected. DX-150 at 2.

As he cemented his control over Katalyst, Valia took steps to prevent Rahul from making the banks whole. Valia opposed additional debt financing and refused to infuse, or allow Rahul to infuse, equity, in part due to Valia's concern that his stake would be diluted, which would limit his control over the board and Company. DX-150 at 2. Valia also rejected Rahul's proposal to sell Katalyst's stake in Nova Techset Private Limited via an IPO or strategic sale. DX-150 at 3. The sale could have raised as much as Rs. 500 Cr., equivalent to approximately $70 million at that time. *Id.* Although this sale could have raised significantly more than all outstanding liabilities of the group and allowed Katalyst to repay all of its outstanding bank loans, Valia's bloc voted Rahul's proposal down at an April 29, 2021 extraordinary general meeting. *Id.*

13

Valia's coup de grâce was a final, January 2022 extraordinary general meeting notice, calling for removal of Rahul from all roles within the Katalyst group of companies. Having already lost control of the board and seeing no path forward, Rahul resigned as KTI CEO that same month. *Id.* Soon thereafter, Valia pulled Katalyst out of the United States entirely, terminating the employment of U.S. personnel and vacating the Company's offices. *See, e.g.*, Ex. K (Letter of Venkat Rao) ("Katalyst was stripped of many valuable assets, including clients and relationships . . . In a single meeting, Mr. Valia promised he would take care of the team, but we never heard back."). As a final move, Valia attempted to divest Rahul of all the value he created at Katalyst through a Scheme of Arrangement, which Rahul is challenging in Indian court. Ex. M (Letter of Nishant Upadhyay).

Over three years later, Katalyst still has no U.S. presence, as far as Rahul is aware. And, now entirely outside of Rahul's control, Katalyst still has not repaid the banks, even though it indubitably has the resources to make full or, certainly, partial repayment. As the full history laid out here makes clear, and as Shobha explains in her letter to the Court, "if Rahul had the ability and access to repay all the debt owed to the banks, which he tried many times, he would do it in a heartbeat." Ex. C (Letter of Shobha Shah). Indeed, Katalyst in India "continues to thrive and make significant money – where we have no control or visibility." *Id. see also* Section IV.B, *infra* (discussing Katalyst's current financials). But Valia has continually prevented Rahul from effectuating repayment to the banks.

That Valia is responsible for KTI's current insolvency and failure to repay the banks is not just Rahul's view; it is also Yes Bank's. In a complaint filed earlier this year against KTI, Katalyst India, and Sudhir Valia, Yes Bank made the following allegations:

- "At all times described in this complaint [that is, beginning in December 2017], KSSL was controlled by Sudhir Valia."

14

- "Valia introduced Rahul Shah and KTI to YES Bank."
- "On behalf of KTI, Valia personally negotiated terms of the Loans with YES Bank."
- "Corporate management of KTI was not conducted by a board or its officers; rather, all corporate decisions were made by KSSL and/or Sudhir Valia."
- "All vendor accounts, loan payments, and other financial arrangements of KTI were managed by KSSL in India."
- "KTI had no meaningful corporate existence apart from KSSL."
- "Prior to KTI making payments to Plaintiff, numerous wire transfers were made from KTI to KSSL for round-number amounts."
- "KSSL is controlled to such an extent by Valia that it is, in fact, his alter ego."
- "KSSL has systematically looted KTI rendering it insolvent and unable to pay its debts."
- "Valia specifically directed KTI and KSSL not to pay the sums due to Plaintiff."
- "Valia, while holding a controlling interest in KSSL and contrary to his contractual obligations under the first and second letters of comfort, caused, consented to, suffered or allowed KSSL to transfer assets, including large sums of money, from KTI to KSSL; thus making those funds unavailable for KTI to pay its obligation to YES Bank."

Complaint at ¶¶ 3, 8, 9, 22, 23, 27, 28, 30, 33, 40, 41, *Yes Bank Ltd. v. Katalyst Tech., Inc.*, No. 2025L002650 (Cir. Ct. Cook Cty., Feb. 24, 2025) (attached hereto as Ex. L).

Valia's actions caused Katalyst to default and prevented Rahul from effectuating repayment of KTI's lenders. Rather than permitting Katalyst to live up to its contractual obligations, Valia has attempted to appropriate its assets for himself. Although Rahul and his family remain 42% shareholders of the Company, Katalyst becomes less valuable by the day as Valia siphons off its assets into entities Valia fully controls.

In 2021, Valia filed a criminal complaint against Rahul in Indian court, alleging that Rahul improperly lured Valia's group into financing the acquisition of Idhasoft. It was because of this complaint that Indian authorities initially would not allow Rahul to return to the United States when he traveled to India in 2023; however, Rahul was able to disprove Valia's allegations, demonstrating through historical emails that the Idhasoft acquisition transaction was Valia's idea, not Rahul's. *See* Ex. M (Letter of Nishant Upadhyay). Once the charges were cleared, Rahul dutifully returned to the United States as soon as possible to face trial in the instant case.

15

### E.     Rahul's Life Has Been Upended by Katalyst's Collapse and by this Case

Rahul's loss of control over Katalyst, and the litigation and prosecution that have ensued, have profoundly impacted his health.  As Shobha explains, these "significant health issues," described below, are "of concern to me and I fear that his health may not hold up in [a] prison environment and I may never see him again." Ex. C (Letter of Shobha Shah).

Rahul grapples daily with various medical afflictions, which rapidly worsened beginning in 2018, after Katalyst's planned IPO fell through and as the rift between Shah and Valia's controlling shareholder group worsened.  Rahul suffers a family history of diabetes and cardiovascular disease; his grandfather, father, and uncle all suffered from both, and his father's death was caused by diabetes and cardiovascular issues.  These conditions were exacerbated for Rahul by the stress caused by Katalyst's collapse, by the civil litigation against him, and by this case.

Rahul was diagnosed with diabetes in 2004 or 2005.  In 2018, Rahul's A1C level (a measure of average blood sugar, which is used to evaluate how well diabetics' blood sugar levels are managed) leapt from 6.5 to over 10. This A1C spike continues to impact Rahul in a variety of ways:

- Beginning in 2018, Rahul suffered significant chest pains and numbness in his right arm. He was hospitalized approximately three or four times for observation and cardiovascular disease.
- Despite his doctors' efforts to bring his A1C back under 7 through the administration of multiple diabetes drugs, due to continued stress, Rahul's A1C level actually further increased.
- Rahul's elevated A1C level impacted his vision, lowered his ability to heal from cuts and bruises, and led to numbness and loss of strength in his left arm.
- In 2019, Rahul was rushed to emergency room on two separate occasions for chest pains; he underwent a battery of tests for cardiovascular diseases.

In 2004, Rahul was also diagnosed with asthma.  He takes Advair and uses an albuterol inhaler twice per day as a result.  PSR ¶ 91.

16

Beginning in 2020, after the government first filed charges against Rahul, his A1C reached an all-time high, and he suffered a significant mental breakdown, requiring the prescription of antidepressants and anti-anxiety medication as well as a course of psychotherapy. In December 2020, he had a medical emergency involving severe chest pain, constant numbness in his left hand, and loss of sensation and strength.

Then, when Rahul's 2022 trip to India was prolonged by unexpected legal complications, stress and a lack of access to his diabetes medication resulted in Rahul's blood sugar significantly escalating, causing a lack of sensitivity in his hands and feet and, ultimately, hospitalization for several days in Mumbai.

Rahul is currently on Ozempic, which controls his A1C better than earlier medications, but particularly in light of his religiously mandated vegetarian diet, he has continued to lose weight to a concerning extent. Rahul also regularly takes metformin and insulin (Lantus) to control his diabetes. PSR ¶ 91. He wears a continuous glucose monitor and carries around candy to keep his sugar level at 70 mg/dL or higher. He experiences hypoglycemia (dangerously low blood sugar) a few times per month, particularly when he is experiencing significant stress. Rahul also suffers from Dawn Phenomenon, in which naturally occurring early-morning hormones inordinately affect his blood sugar.

Beyond diabetes, asthma, and cardiovascular issues, Rahul suffers from high cholesterol, acid reflux, and Benign Prostatic Hyperplasia, for which he takes Lipitor, Rabeprazole, and Flomax, respectively.

Rahul's mental health has also suffered as a result of everything that has transpired over the past several years. Between 2019 and 2022, Rahul experienced anxiety and frequent panic attacks, as well as chest pain, numbness of the limbs, tingling sensations, and difficulty sleeping,

17

resulting in an emergency room visit. PSR ¶ 93. Rahul saw a therapist during that period and received counseling from Dr. Caroline Loeb at Northwestern Hospital, who prescribed Clonazepam for anxiety. *Id.* Rahul continues to face feelings of depression over Valia's profound betrayal and the dismantling of Katalyst, a company he worked so hard to build. PSR ¶ 95. Compounding these issues is the loss of important relationships, as Rahul and Shobha have seen friends and even family members withdraw from their lives as a result of the ordeal. *Id.* ¶ 85.

## II. THE COURT SHOULD IMPOSE ONLY THE MANDATORY SENTENCE OF TWO YEARS AND TWO DAYS' IMPRISONMENT

### A. Guidelines

The PSR calculates a total offense level of 36 and a criminal history category of I. PSR ¶ 51-77. The government calculates a higher total offense level of 38, but agrees that the appropriate criminal history category is I. Government's Version at 20. Both offense-level calculations are wrong: they dramatically overstate the loss attributable to the offenses of conviction, and the government (though not the PSR) incorrectly applies the obstruction enhancement.

#### 1. Loss

The government has the burden of establishing, by a preponderance of the evidence, the losses that were inflicted as a result of the offense conduct. *United States v. Newton*, 76 F.4th 662, 672 (7th Cir. 2023). The evidence supporting the loss calculation must have "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a) (emphasis added); *see Newton*, 76 F.4th at 674 ("A defendant is entitled to have sentencing determinations made based on reliable evidence rather than speculation or unfounded allegations." (quoting *United States v. Nelson*, 774 F.3d 1104, 1107 (7th Cir. 2014)). The government cannot rely on "unsupported assumption[s]" in proving loss. *United States v. Moore*, 52 F.4th 697, 701 (7th Cir. 2022) ("[A] defendant whose

18

liberty is at stake is entitled to hold the government to its burden of proof by a preponderance of reliable evidence."). Indeed, Rahul has "a due process right to be sentenced based on reliable information." *United States v. Barker*, 80 F.4th 827, 833 (7th Cir. 2023).

Under Note A to Guideline § 2B1.1(b)(1), "loss" is defined as "the greater of the actual loss or intended loss." Here, the Government does not argue, or provide any evidence supporting the contention, that any loss was intended. Accordingly, under the Guidelines, the actual loss, if any, governs. Note C(i) to Guideline § 2B1.1(b)(1) defines "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." And "[r]easonably foreseeable pecuniary harm," in turn, is defined as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." Guideline § 2B1.1(b)(1), Note (C)(iv). The Court's determination of "whether loss was reasonably foreseeable" requires "two separate [causation] analyses: but for causation and proximate causation." *United States v. Burns*, 843 F.3d 679, 688 (7th Cir. 2016). The Government may not rely on losses attributable to "superseding causes." *Id.* at 689.

In the case of a secured loan, loss shall be reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." § 2B1.1 App. Note 3(E)(i)–(ii).

The 22-level enhancement to the offense level proposed by the government because "the total loss amount for purposes of § 2B1.1(b)(1) should be approximately $46,337,117.05," Supplemental Government's Version at 2, is unsupported by the evidence, and it would be inappropriate under the Guidelines to apply such an enhancement.[3]

---

[3] Defendant also notes the broad agreement that the Guidelines' loss table is unduly harsh, so much so that in a recent Federal Register notice, the United States Sentencing Commission announced

To calculate the "actual loss," the government and the PSR simply add up the amounts Katalyst owes to Bank of Baroda, State Bank of India, and Yes Bank (there are no funds owed to Bank of India or PNC Bank). This approach is inadequate to prove actual loss for several reasons.

*First*, even assuming that Rahul made knowingly false statements to the banks, this fact alone is insufficient to prove that the false statements caused the banks' loss. *See United States v. Rothwell*, 387 F.3d 579, 584 (6th Cir. 2004) (where the Government provided no "explanation of why or how Rothwell's fraudulent conduct during the construction of the building made it more likely that Rothwell would later default on the loan," loan losses could not be attributed defendant); *United States v. Isaacson*, 752 F.3d 1291, 1305–07 (11th Cir. 2014) (finding "far too much speculation is necessary to attribute that investment loss to the conspiracy to defraud the auditors" and remanding for resentencing); *United States v. Lonich*, 23 F.4th 881, 918 (9th Cir. 2022) (vacating and remanding for resentencing where the loss amount was premised on defendants having caused the bank to fail, but the government failed to prove causation). Here, the government has not proven, and does not know, what Katalyst's true accounts receivable and revenue figures were, as it never obtained Katalyst's internal books and records. (Rahul is no longer an employee of Katalyst and likewise lacks those records, having in his possession only a fraction of his own Katalyst email account and little else from the Company.) Borrowers default on loans for all sorts of reasons, and it is far from clear that the reason Katalyst defaulted had anything to do with any possible inflated accounts receivable and revenue figures provided to the banks. *See Rothwell*, 387 F.3d at 584 ("There are myriad explanations for the default—an unsound

---

that one of its "policy priorities for the upcoming amendment cycle" is to reexamine whether "the guidelines appropriately reflect the culpability of the individual and the harm to the victim, including (A) reassessing the role of actual loss, intended loss, and gain [and] (B) considering whether the loss table in §2B1.1 should be revised to simplify application or to adjust for inflation." Final Priorities for Amendment Cycle, 90 Fed. Reg. 24710 (Aug. 6, 2025).

business risk, a poor economy, excess warehouse or office space in the local market, or developments in unrelated transactions affecting Rothwell's ability to repay the SBA loan—all of which are more likely causes than the fraud-induced progress payment.").

*Second*, while the government bears the burden of proof as to loss, only the defense that has proffered evidence directly showing why the banks were not repaid by KTI: the intervening and unforeseeable actions taken by Sudhir Valia. In calculating the loss amount, the defendant may not be held responsible for losses caused by others unless those losses were reasonably foreseeable and within the scope of the criminal activity that the defendant "agreed to jointly undertake." USSG § 1B1.3, comment. (n.3(B), (D)). And as discussed above, losses attributable to a "superseding cause that breaks the causal chain" are not part of the loss amount. *United States v. Burns*, 843 F.3d 679, 689 (7th Cir. 2016). Thus, *United States v. Burns*, the Seventh Circuit found reversible plain error because a Ponzi scheme about which the defendant did not know, rather than the defendant's own conduct, may have been responsible for the loss. *Id. See also United States v. Lloyd*, 807 F.3d 1128, 1142, 1145 (9th Cir. 2015) (reversing District Court attribution of fraud losses from a California telemarketing "boiler room" where defendant managed only a separate, Florida boiler room, because defendant did not design the overall scheme, did not pool resources, and was compensated from commissions from only his operation). Even in the context of a conspiracy, "a district court may not automatically hold an individual defendant responsible for losses attributable to the entire conspiracy, but rather must identify the loss that fell within the scope of the defendant's agreement with his co-conspirators and was reasonably foreseeable to the defendant." *United States v. Treadwell*, 593 F.3d 990, 1002 (9th Cir. 2010), *overruled on other grounds by United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020).

21

Here, there was no allegation or finding of a conspiracy between Valia and Rahul, and Valia's actions were neither foreseeable at the time the loans were entered into nor something Rahul "agreed to jointly undertake." Instead, Valia's actions—including, as set forth in greater detail above, his takeover of the Katalyst board, refusal to ratify any of the measures proposed by Shah to allow for repayment of KTI's debts, ejection of Rahul from the Company, and withdrawal of Katalyst from the United States—resulted in Rahul losing control over the Company and preventing Rahul from ensuring that Katalyst lived up to its obligation to repay the banks.

Because the government has provided no evidence as to causation, while the defense has, the government's unsupported conclusion that the misrepresentations to the banks caused the banks' losses should be disregarded. *See United States v. Moore*, 52 F.4th 697 701 (7th Cir. 2022) ("Because [defendant] provided 'some evidence' . . . and because the government submitted no evidence in response, the district court erred when it accepted the government's unsupported assertions and effectively shifted the burden of persuasion to [defendant].").

Where the loss caused by the defendant is not reasonably determinable, the increase in the offense level under Guidelines § 2B1.1 is determined by reference to the gain that resulted from the offense. As discussed below, there is no gain. *See* Section II.B.1.a, *infra*.

### 2. Additional Specific Offense Characteristics

#### a. The Sophisticated Means Enhancement Does Not Apply to the "PPP Scheme" (Counts 12-17)

The sophisticated means enhancement applies to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." § 2B1.1 App. Note 9(B). To qualify, the offense must have been more complex than a "garden-variety . . . fraud." *United States v. Higdon*, 531 F.3d 561, 564 (7th Cir. 2008). Examples of sophisticated

22

means are "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." § 2B1.1 App. Note 9(B).

To the extent that the Court disagrees with the government's grouping analysis, the defense notes that the PPP loan-related counts (counts 12-17), which the Government's Version groups together as the "PPP scheme," are premised on the submission of false documents. Because this scheme was carried out in a "garden variety" manner, the sophisticated means enhancement should not be applied to the relevant counts. *See, e.g., United States v. Simon,* No. 3:10-CR-00056(01)RM, 2011 WL 924264, at *7, 12 (N.D. Ind. Mar. 14, 2011) (applying sophisticated means enhancement to tax counts, for which defendant used "multiple entities to hide and disguise income," but rejecting enhancement for wire fraud counts, for which defendant simply used false tax forms to obtain financial aid). The PSR agrees with this conclusion. *See* PSR ¶ 61.

### b.      Rahul Did Not Commit Obstruction

The PSR correctly concludes that no enhancement for obstruction of justice is warranted here. Under Guideline § 3C1.1, the offense level is increased by 2 levels if the defendant "willfully obstructed or impeded, or attempted to obstruct of impede, the administration of justice with respect to the . . . prosecution . . . of the instant offense or conviction." Guideline § 3C1.1. As the Commentary to that provision notes:

> This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt or provide information to a probation officer, or refusal to enter a plea of guilty is not a basis for application of this provision. In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

Guideline § 3C1.1 App. Note 2. The only false testimony identified in the Government's Version concerns Rahul's knowledge; the government infers from the fact that "the jury found . . . that he

23

acted knowingly and with intent to defraud" that Rahul committed perjury in denying that he knew that the submitted information was false. Government's Version at 18-19. Yet the jury made no specific findings as to which statements Rahul knew to be false, and the government points to no direct evidence contradicting Rahul's statements. Rahul's statements amounted to a mere denial of guilt, not "a willful attempt to obstruct justice," which is what the Guidelines require. *See also* PSR ¶ 67 ("The defendant is entitled to exercise his right to a trial and, in doing so, to deny his guilt.").

B.      Section 3553(a) Factors

In determining an appropriate sentence, the Court must comply with 18 U.S.C. § 3553(a), which requires that the court "impose a sentence sufficient, but not greater than necessary" to achieve the purposes of sentencing. In applying the § 3553(a) factors, the Court enjoys broad discretion "to fashion an appropriate, individualized sentence" that "fit[s] the offender and not merely the crime." *United States v. Warner*, 792 F.3d 847, 855 (7th Cir. 2015) (quoting *Pepper v. United States*, 562 U.S. 476, 487-88 (2011)). A Guidelines sentence is not presumptively reasonable, nor is a below-guideline sentence presumptively unreasonable. *United States v. Hill*, 645 F.3d 900, 905 (7th Cir. 2011); *see also United States v. Jordan,* 435 F.3d 693, 698 (7th Cir. 2006). Indeed, as the Supreme Court has made clear, no "extraordinary circumstances" are required to support a variance from the advisory Guidelines range, or even to justify a sentence of probation. *Gall v. United States*, 552 U.S. 38, 47 (2007). The sentencing court's guiding principle mut be to "make an individualized assessment based on the facts presented." *Id.* at 50; *see also United States v. Young*, 590 F.3d 467, 474 (7th Cir. 2010). It is the sentencing court's decision what weight to place on any one of the factors identified in 18 U.S.C. § 3553. *See Gall*, 552 U.S. at 47; *United States v. Johnson*, 471 F.3d 764, 766 (7th Cir. 2006) ("The statute does not weight the factors. That is left to the sentencing judge, within the bounds of reason, which are wide").

24

Here, the § 3553(a) factors strongly support a below-Guidelines sentence of two years and two days of imprisonment, which is the statutory mandatory minimum.[4]

### 1. The Nature and Circumstances of the Offense Support a Below-Guidelines Sentence

In determining an appropriate sentence, the Court must consider the "nature and circumstances of the offense" as they pertain to Rahul. 18 U.S.C. § 3553(a)(1).

### a. Indian Bank Loans

It is the government's position that Rahul should be sentenced as if he is the only person responsible for the false statements made to the banks and the only person who benefitted from the loans made to Katalyst. Neither proposition is true, and the government's position, and the concurring Guidelines calculation, dramatically overstate Rahul's culpability here. As a result, this factor weighs heavily in favor of a lesser sentence than argued by the government or suggested by the Guidelines.

The government treats Rahul as if he was solely responsible for the initiation of the bank loans, the creation and presentation of false documents to the banks, and the decision not to repay those loans. This unfairly ignores the central role that Valia and others in the Katalyst organization played.

---

[4] Each count of aggravated identity theft (Count Sixteen and Seventeen) carries a two-year mandatory minimum sentence which must be consecutive to any other sentence imposed, but which may run concurrently with each other. 18 U.S.C. § 1028A(b)(2) and (4). Count Six, which included the violation for committing an offense while on release (18 U.S.C. § 3147), also requires the imposition of a consecutive term of imprisonment to follow the underlying bank fraud count. The Court should impose a term of imprisonment of one day on each of the underlying fraud or money laundering counts (Counts Twelve and Thirteen), to be served concurrently, with a consecutive sentence of one day of imprisonment for the violation of 18 U.S.C. § 3147 under Count Six, and then a consecutive sentence of two years' imprisonment on Counts Sixteen and Seventeen, which should be served concurrently with each other.

As an initial matter, the loans were arranged by Valia, the billionaire who had the relationships with the banks in India, not Rahul. The banks made the loans to Katalyst because of their interest in working with Valia's companies, not because they had any relationship with Rahul. Valia controlled the bank relationships; as Rahul explained at trial, Valia's group insisted that "[t]hey would like to manage the financing because they had an incredible Rolodex of bankers and investment bankers and they didn't want me to worry about that piece of it, how to finance the company. They wanted me to focus on growing the business." 6/20 Tr. 74:1-8. Ultimately, in terms of securing the bank loans themselves, "All the banking relationships, all the interactions were done by Mr. Valia." 6/24 Tr. 93:18-94:7. Moreover, Katalyst's finance department was, at the relevant times, based on India, and Valia installed his own people into various finance and accounting positions. 6/20 Tr. 75:7-21.

Rahul was involved in the loans only because the banks in India decided that due to Indian banking regulations, they needed to make the loans from their American subsidiaries rather than from India-based banks. As a result, the banks insisted that an American citizen signed the loans at issue—which meant that it was Rahul, rather than Valia, who had to sign and guarantee the loans, while Valia merely had to sign a "letter of comfort" with the banks. But it was Valia's relationships that led to each bank loan.

Further, as described above, Rahul was not the person who created the false records submitted to the banks. At trial, the defense presented substantial evidence showing that others at Katalyst were responsible for preparing submissions to KTI's lenders. For example, the defense introduced numerous emails attaching borrowing base statements and other financial data that were sent not by Rahul, but rather by the Katalyst Finance Department. See, e.g., DX-162 (February 19, 2020 email from Katalyst Finance Department to State Bank of India regarding

26

Borrowing Base Statement as of January 2020); DX-328 (January 26, 2017 email from Katalyst Finance Department to Bank of Baroda attaching drawing power calculations); DX-328A (accounts receivable and drawing power calculation attachment, with metadata showing that the document was created and last modified by Manjari Gupta). In contrast, the government presented no witness, nor any documents or metadata, that suggested that Rahul created anything related to the borrowing base submissions. Which makes sense: Katalyst's organization charts showed workers based in India (led by an Indian-based CFO) did the bulk of the financial work for Katalyst (led by an Indian CEO). The testimony from both government and defense witnesses was consistent: Rahul focused on sales and management. No one suggested that he was in charge of finances at Katalyst.

Instead, deposition testimony from Mitesh Shetty, a former Katalyst India employee, (which the jury did not hear) showed that the falsified bank statements were prepared by the company's Indian CFO, Chandrashekar Venkatraman. Further, Mr. Shetty had no reason to believe that Rahul had any involvement in the process of creating the bank statements, or even had reason to know that false bank statements were created:

> On many occasions over the years, Mr. Shetty saw Mr. Venkatraman modifying PDF bank account statements, including statements for an account at JPMorgan Chase bank belonging to Katalyst Technologies. . . . Mr. Shetty . . . has never seen or heard anything suggesting that Rahul was involved with or even aware of the process of modifying bank statements.

See ECF No. 267 at 2.

Finally, the government's position overstates Rahul's culpability because it treats him as if he personally received or benefitted from the entirety of the loans that were provided to Katalyst. This was demonstrably not true; Rahul poured significant funds from his personal savings into the company, while the loan money was overwhelmingly used to run and grow Katalyst and remains

locked into the equity that Katalyst still has. But Katalyst is now controlled by Valia, who has decided that he will not pay.

The Government's Version takes issue with the use of loan funds obtained from Bank of India, noting that $1 million sent by Bank of India was used to fund the purchase of real property by the Shah family in September 2015. Government's Version at 5. But Rahul did not misappropriate loan funds to buy himself a house. Instead, Katalyst used loan proceeds to repay working capital loans Rahul had earlier made to Katalyst, which was a permissible use of the funds. In just the seven-month period before the real-property acquisition, the Shah family had loaned Katalyst approximately $1,362,240—significantly more than the million the government focuses on. DX-521. Moreover, only $824,750 of the funds from the Bank of India line of credit draw were sent along for use in the real property purchase transaction. And apart from that $824,750 from Bank of India, the government has shown only two other transactions in which bank-loan funds were transferred to Rahul, totaling $305,000. See GX-910 (Flow of Funds – September 11, 2019 State Bank of India Draw); GX-917 (Flow of Funds – July 2, 2018 State Bank of India Draw). Thus, even disregarding, counterfactually, the Shah family's loans to Katalyst, the government has shown, as most, a gain derived from loan funds of $1,129,750.[5] And taking into account loan funds furnished by the Shahs to Katalyst, Rahul's net gain from loan funds is zero. *See* DX-521.[6]

The government's suggestion that Rahul caused Katalyst to borrow almost $62 million so he could line his own pockets, but then derived zero net gain from the bank loans, makes no sense. It also is not an accurate reflection of what really happened. Rather, Rahul was a bit player in

---

[5] That gain would result in a 14-level enhancement under § 2B1.1(b)(1)(H), rather than the 22-level enhancement applied by the PSR. PSR ¶ 59.

[6] Similarly, Rahul earned a total of $0 from the PPP loan applications at issue.

Valia's larger scheme to use Rahul's U.S. company to extract millions of dollars from Indian bank branches in the United States, remit the funds to India, deprive Rahul of control over the funds, and deny the banks the interest and principal payments they were owed—leaving Rahul to hold the bag. Indeed, we have been able to identify over $9 million in transfers from KTI to KSSL in the government's authentic-bank-statement compilation exhibit. *See* GX-400B; Ex. N (list of payments from KTI to KSSL from 2015-2020). Thus, while some of the bank funds remained in the United States to support KTI operations, a large portion was funneled by Valia directly to KSSL, and are now out of Rahul's reach.

### b. PPP Loan Application

The sky-high guidelines range the government supports also dramatically overstates any culpability that Rahul has in relation to the PPP loan counts. At root, there was no loss for the PPP loan, nor was there ever any real chance there would be. The two-year-and-two-day mandatory minimum sentence that is required more than punishes Rahul for this aspect of the crime.

Again, the government did not present any witnesses or documents that showed that Rahul directed that false documents be created, or participated in creating the false submissions himself. Instead, the only evidence from any witnesses about the creation of the PPP loan documents, including not just Rahul but also through the deposition testimony of Jibi John, Katalyst's head of operations in India, was that Rahul simply asked for the necessary documents to be prepared, not that false documents be created. John Dep. 8:40:18–8:51:43. As John explained, the false N2N tax forms were provided by an N2N payroll analyst in India, Niranjan Challa, whom Rahul did not ask to provide false information.

What is also undisputed is that Katalyst and Codesoft sought and received PPP loans for significantly more money at the same time as the N2N application, and that those applications

were both appropriate and prepared by other Katalyst personnel. The same was true of the N2N application, which Rahul lacked the necessary skills to create himself.

The government's assertion that Rahul "knew that N2N's total yearly employee compensation in 2019 was only $48,870.17" is baseless. The government merely asserts this, and provide no citation or any other evidence that Rahul knew what N2N's total yearly employee compensation was in 2019, or any other year. The government's assertion is also belied by the fact that contemporaneous employee timesheets showed 3,894.25 employee hours billed to N2N in 2019—a number that did not account for time spent on N2N business by Ray Bellan, a senior, highly compensated employee who testified that he was running N2N at the time, or by Rahul and Shobha Shah. See DX-522. Assuming conservatively that the average N2N employee's labor was worth $25/hour, the 3,894.25 employee hours logged in the timesheets would result in $97,356 worth of annual labor—over double what Rahul supposedly "knew" was the true payroll amount. And again, this excludes time spent on N2N work by Bellan and the Shahs. Moreover, given that Katalyst and N2N shared employees, Rahul was not aware of the precise allocation of employee time, or employee compensation expenses, between the two companies. It is entirely reasonable that Rahul would have believed in good faith that N2N's monthly payroll was consistent with the data provided to him by Challa, the N2N payroll analyst in India.

There were errors in what was submitted in N2N's loan application, but they were not errors created by or directed by Rahul. In any event, PNC Bank never approved the PPP loan, and no funds were disbursed to N2N or Rahul as a result of any of the PPP loan applications.

### 2. Rahul's Extraordinary Personal History and Characteristics Support a Below-Guidelines Sentence

The Court is also required to consider the "the history and characteristics of the defendant." § 3553(a)(1). These weigh heavily in favor of a far-below-Guidelines sentence. Business,

30

financial, and legal troubles have devastated Rahul and his family over the past several years, but as letters submitted to the Court from Rahul's family, friends, and former colleagues demonstrate, Rahul is compassionate, kind, and generous with both time and money. This is evident from the letters submitted to the Court detailing how Rahul has taken care of his extended family, including by dropping out of college to return home to Pune to care for his ailing father and save the family business, and by welcoming his sister-in-law, Asha, and her daughter, Neha, into his home with open arms in their time of intense need, treating Neha like a daughter. It's evident in the letters from former Katalyst employees, who described Rahul as a compassionate boss who "always prioritized the well-being . . . of his team members." Ex. G (Letter of Prajakta Gandhi). And it's evident from Rahul's track record of support for the communities in which he has lived—from mentoring Northwestern students to steadfastly supporting various educational, artistic, and religious causes.

### 3. Rahul Suffers a Panoply of Medical Issues that BOP Will Not Be Able to Adequately Manage

The Court should also consider Rahul's age and serious medical issues to a sentence well below the Guidelines. *See United States v. Powell*, 576 F.3d 482, 499 (7th Cir., 2009) (remanding because district court failed to "consider Powell's arguments about his advanced age and infirm health in light of the factors outlined in 18 U.S.C. § 3553(a)").

As discussed above, Rahul battles daily with numerous physical and mental health afflictions, including diabetes, asthma, high cholesterol, acid reflux, Benign Prostatic Hyperplasia, cardiovascular issues, and anxiety and panic attacks, requiring regular and consistent treatment through a veritable alphabet soup of medications, including a continuous glucose monitor, insulin, metformin, Ozempic, Lipitor, Flomax, Rabeprazole, an albuterol inhaler, and Advair.

It is doubtful that the Bureau of Prisons will be able to provide Rahul with medical care adequate to manage his many health conditions. Reporting indicates that providing medical care for inmates is not a priority of the current administration. *See* Walter Pavlo, *Sweeping Changes for the Bureau of Prisons Under the Trump Administration*, Prisonology (Jan. 23, 2025), https://www.prisonology.com/blog/sweeping-changes-for-the-bureau-of-prisons-under-the-trump-administration ("[m]edical professionals, essential to the BOP's ability to address the needs of an aging and often ill inmate population, were notably absent from" the list of exemptions from a government-wide hiring freeze). And even in the best of times, the Bureau of Prison's (BOP) chronically fails to provide adequate medical care to inmates; indeed, "BOP's medical care system is known for its failure to provide timely and sufficient medical care for serious conditions." *See* Nicole B. Godfrey, *Decades of Indifference and Failures in Accountability in the Provision of Medical Care in Federal Prisons*, 25 Nev. L.J. 755, 759 (2025). The reasons for this are myriad:

> [C]hronic staffing shortages delay the provision of care to incarcerated people suffering from serious illnesses; a refusal to engage in robust and critical mortality reviews for each in-custody death inhibits the BOP's ability to make critical procedural and structural changes in the provision of care; the aging of the federal prison population increases the number of people incarcerated in federal prisons who are in need of critical care; a failure to utilize the mechanisms of compassionate release ensures that the burdens of care remain on the BOP; and an overall lack of accountability and oversight of the federal prison system in its entirety allows these failures to continue unchecked for decades.

*Id.* at 760-61. In short, the BOP is unlikely to provide Rahul with adequate medical care, and given his serious medical conditions, a failure to consistently provide adequate medical care could place his life in jeopardy.

### 4. Deterrence Goals Are Still Met by a Below-Guidelines Sentence

There is no question that Rahul will be punished severely here. Not only is he going to be sentenced to at least two years and two days' imprisonment, but the company to which he has

devoted his working life has been taken from him, and he faces financial ruin and serious health challenges. Thanks to Valia's actions, Rahul has lost all control over Katalyst—and will hand over his entire interest in the company to the banks to compensate them. And, as detailed above, over the past several years, Rahul has lost friends and familial relationships, suffered serious health setbacks, and struggled with anxiety and panic attacks. In short, he is devastated in every aspect of his life. The negative business, financial, personal, emotional, health, and familial consequences suffered by Rahul will deter him and similarly situated individuals from engaging in illegal conduct in the future. Nothing more is needed to serve the purposes of specific and general deterrence.

Further, the harsh penalties sought by the government will not advance any goals of deterrence. Academic literature has found that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) (emphasis added). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."); Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* 1-2 (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF ("[C]orrelations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance . . . the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." ).

This finding holds true specifically with respect to white collar offenders as well. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

The case law, too, makes clear that the Court should consider the statistically low risk of recidivism presented by Rahul's history and characteristics in determining what constitutes a "sufficient, but not greater than necessary," sentence. As a 56-year-old first-time offender who is now a convicted felon, Rahul is unlikely to recidivate. *See, e.g., United States v. Urbina*, 2009 WL 565485, at *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum*, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); *United States v. Ward*, 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense); *United States v. Darway*, 255 Fed. App'x 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Hamilton*, 323 Fed. App'x 27, 31 (2d Cir. 2009) ("[T]he district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Cabrera*, 567 F.Supp.2d 271, 279 (D. Mass. 2008) (granting

variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders").

Here, a sentence of incarceration beyond the mandatory two-year minimum is not necessary to send Rahul, or individuals like Rahul, a message to dissuade them from participating in the same kind of conduct. Put differently, the two-year mandatory sentence of imprisonment here meets the test of being sufficient, but not greater than necessary, such that no further punishment is just.

## III.  FINE AMOUNT CAPPED BY *APPRENDI*

The PSR recommended correctly that no fine is appropriate here. PSR Rec at 1. In the event the Court disagrees, the maximum fine is limited to the provisions set forth in 18 U.S.C. § 3571(b)(1) and (3), which point the Court to either the specific fine amount set forth in the crime of conviction or the statutory default amount of $250,000 for an individual.

Under those provisions, the maximum statutory fine for Rahul is $1,000,000 per count for Counts One through Eight and Twelve through Fifteen, and $250,000 per count for Counts Nine, Ten, Sixteen and Seventeen. But neither the Alternative Fine Act (18 U.S.C. § 3571(d))[7] nor the alternate fine provision in 18 U.S.C. § 1957(b)(2)[8] can apply here (notwithstanding the PSR's conclusion to the contrary on the latter provision (PSR at ¶125)) because Rahul was not charged

---

[7] 18 U.S.C. § 3571(d), titled "Alternative Fine Based on Gain or Loss," states "[i]f any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss, unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process."

[8] 18 U.S.C. § 1957(b)(2) states "[t]he court may impose an alternate fine to that imposable under paragraph (1) of not more than twice the amount of the criminally derived property involved in the transaction."

in the Second Superseding Indictment, nor has a jury found the facts that would be necessary to determine a punishment under either provision.

The Fifth and Sixth Amendments to the U.S. Constitution require that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt [or admitted by the defendant]." *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000). The principles set forth in *Apprendi* apply equally in the context of criminal fines. *See Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012) (holding that *Apprendi* applies to fines).

Those principles guard "against[] judicial factfinding that enlarges the maximum punishment a defendant faces beyond what the jury's verdict or the defendant's admissions allow." *Id.* at 352. Accordingly, courts cannot impose fines that require judicial fact-finding to increase the statutory maximum. For example, where a corporation violated a statute imposing a maximum fine of $50,000 for each day of violation, a fine of more than $50,000 could not be imposed without a jury finding regarding "the number of days the company violated the statute." *Southern Union*, 567 U.S. at 359.[9] Similarly, where a corporation violated a statute imposing a maximum fine of $500,000 or two times the gross loss from the offense, the judge could not impose a fine of more than $500,000 without "a jury finding [as to] loss amount." *United States v. LaGrou Distribution Sys.*, 466 F.3d 585, 594 (7th Cir. 2006).

Here, the Second Superseding Indictment does not allege, nor did the jury find, that anyone derived a "pecuniary gain" or anyone suffered a "pecuniary loss," nor what twice any resulting

---

[9] Before *Southern Union*, the Seventh Circuit had determined the opposite: that *Apprendi* did not apply to a statute permitting fines of $50,000 per day because that statute "does not have a prescribed statutory maximum penalty." *United States v. Chemetco, Inc.*, 274 F.3d 1154, 1160-61 (7th Cir. 2001). That result is irreconcilable with *Southern Union* and is no longer good law.

gross gain or gross loss might be for purposes of the Alternative Fine Act. Similarly, there is no allegation or jury finding as to what "twice the amount of the criminally derived property involved in the transaction" is for purposes of 18 U.S.C. § 1257(b)(2). In the absence of any such charges or findings, there cannot be judicial fact-finding on those points, and Rahul cannot receive a fine in excess of the maximum fines set under the respective criminal provisions or the statutory default provision in 18 U.S.C. § 3571(b)(3).

## IV. RESTITUTION

### A. The Court Should Not Find Impose Restitution for Losses Rahul Did Not Cause

The applicable restitution statute requires that the Court order the defendant to make restitution to the victim of the offense, in an amount equal to the value of the property the victim lost. 18 U.S.C. § 3663A. But as discussed extensively above, Rahul did not cause the banks' losses in this case; Valia did. It was Valia, not Rahul, who siphoned Katalyst's U.S. assets to India then removed Rahul's ability to control those assets or the Indian assets of KSSL. Rahul cannot be made to pay restitution for a loss he did not cause. *See* 18 U.S.C. § 3663A(a)(2) (defining "victim" as a person "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered"); *United States v. Betts*, 99 F.4th 1048, 1061 (7th Cir. 2024) ("To determine whether a victim's actual losses are "directly and proximately" caused by the offense of conviction as set forth in 18 U.S.C. § 3663A(a)(2), courts look at both cause-in-fact (but-for causation) and proximate cause.").

Notwithstanding this, in the interest of helping to make the banks whole for the loans to KTI, Rahul is willing to hand over to the banks his entire shareholding in KSSL. Based on the limited information available to him, Rahul believes KSSL is worth as much as $100 million today, and his stake is approximately 33% (Naman, Asha, and Neha each own 3%, bringing his family's

37

total shareholdings up to 42%).  Attached as Exhibit O is an  annual report for KSSL (which Rahul has had no managerial control over since his January 2022 resignation) for the year ending March 2025.  The report details KSSL's finances for the most recent full fiscal year.  KSSL and its subsidiaries lost a significant amount of business after retreating from the United States and as former employees have taken clients with them, but the report indicates that KSSL nonetheless earned a profit of approximately $1.2 million in the year ending March 2025, even after paying over $1.2 million in high-cost interest.  Ex. O at 25, 85.[10]  Based on the sector's PE multiple of 55.53x, KSSL is worth approximately $67 million.[11]  Rahul has attempted to use the Indian courts to prevent Valia from expropriating KSSL's assets, and in spite of everything (and without Rahul's involvement), HDFC Bank Limited recently (September 2023) loaned over $1.5 million to KSSL, affirming that KSSL holds real value.[12]  In exchange, Rahul asks merely for an offset of the restitution owed in the amount of the market value of his KSSL shares.

The Probation Office's Sentencing Recommendation advises that the Court should require that a "partial lump sum of $1 million . . . be paid within 60 days of sentencing."  Sentencing Rec. at 5.  Rahul does not have $1 million in liquid assets.  As noted below, the PSR triple-counts Rahul's N2N Technologies India stock, which is in any event a relatively illiquid asset.  The vast majority of Rahul's other assets are also illiquid.  Rahul will not be able to meet this condition,

---

[10] The applicable exchange rate on March 31, 2025 was approximately 85.10 INR per 1 USD. *See* https://mumbaiport.gov.in/show_content.php?lang=1&level=2&ls_id=1342&lid=1067.

[11] *See* https://www.moneycontrol.com/india/stockpricequote/finance-investments/n2ntechnologies/VM03.

[12] Information available from the Indian Ministry of Corporate Affairs, https://www.mca.gov.in/content/mca/global/en/mca/master-data/MDS.html.  The HDFC loan was previously registered with Katalyst Software Services Limited, but is now registered with Nova Techset Limited.

and it should not be imposed on him; rather, Rahul will turn over all of his KSSL shares to make a down payment on whatever quantum of restitution the Court determines Rahul owes.

### B. The Court Should Not Impose Restitution on Amounts Beyond the Principal

The government seeks restitution for interest (both "normal" and "penal") and other expenses beyond the principal of the loans that were made to Katalyst. *See* Gov. Supplemental Version at 1.[13] This is improper. The MVRA does not allow restitution for anything beyond "the value of the property," which in this case is the money lent—not the interest that the banks hoped to earn as profit. Indeed, the MVRA does not permit "lost profits" to be the basis for restitution. Accordingly, the government's proposed restitution goes beyond what is permissible under the MVRA, and should be denied to the extent it seeks anything beyond return of the principal.

The MVRA allows restitution of "the value of the property," 18 U.S.C. § 3663A, and in the context of a bank loan, the property "is the money lent." *Robers v. United States*, 572 U.S. 639, 641 (2014); *see also id*. at 643 ("if the 'property' that was 'damage[d],' 'los[t],' or 'destr[oyed]' was the money, then 'the property ... returned' must also be the money" (alterations in original)). As a consequence, the interest or other fees that the banks might charge related to the loan, such as penalty provisions, are not the "property" that the MVRA recognizes. Instead, interest or related fees are functionally the profit that the banks might receive from loaning the principal.

That distinction is important because "lost profits" are not available for property crimes under the MVRA. The fraud and money laundering counts here are offences against property— not bodily injury to a person—which is a critical distinction. The MVRA allows "income lost by"

---

[13] The government seeks a total of $22,015,135.50 in restitution on behalf of State Bank of India (including "normal" and "penal" interest (Supplemental Government's Version Ex. L)), $10,050,785.15 on behalf of Bank of Baroda (including "normal" and "penal" interest (Supplemental Government's Version Ex. N)), and $27,730,554.61 on behalf of Yes Bank Limited (including "interest" and "penal" entries (Supplemental Government's Version Ex. M)).

the victim to be awarded only "in the case of an offense resulting in bodily injury to a victim," but not "in the case of an offense resulting in damage to or loss or destruction of property." *Compare* 18 U.S.C. § 3663A(b)(2) with 18 U.S.C. § 3663A(b)(1). As a result, the "measure of relief [permitted by the MVRA] is less generous than common law damages, since it does not extend to consequences beyond the diminution of the value of the property stolen or damaged, consequences that could easily exceed that diminution." *United States v. Scott*, 405 F.3d 615, 618 (7th Cir. 2005) (citation omitted); *accord United States v. McCormack*, 152 F.4th 428, 430–31 (3d Cir. 2025) ("And lost sales . . . are consequential damages not covered by the MVRA. . . . As the government concedes, the District Court should not have compensated the gun store owners for their lost income.")(citation omitted); *United States v. Buchanan*, Nos. 22¬3301/3697, 2023 WL 5352223, at \*9 (6th Cir. Aug. 21, 2023) ("Because the [MVRA] does not provide for the recovery of lost income for offenses resulting in property damage, the district court's restitution order including lost potential income during the time period the store was closed for repairs was in error."); *United States v. Mitchell*, 876 F.2d 1178, 1183 (5th Cir. 1989) ("Congress is clearly capable of authorizing restitution for lost income when it chooses to do so. Despite this fact, it has not included lost income in the type of restitution that may be ordered in property cases and, unless and until it amends the statute to include lost income, courts may not order such restitution in property cases." (citation omitted)); *United States v. Sharp*, 927 F.2d 170, 174 (4th Cir. 1991); *United States v. Arvanitis*, 902 F.2d 489, 497 (7th Cir. 1990).[14]

---

[14] *Mitchell*, *Sharp*, and *Arvanitis* predate the MVRA and instead construe its predecessor, the Victim and Witness Protection Act of 1982, but the Seventh Circuit has recognized that "the VWPA and the MVRA are nearly identical in authorizing an award of restitution" such that "court decision in interpreting the language of the VWPA are helpful in construing the language of the MVRA." *Betts*, 99 F.4th at 1061 n.4 (*quoting United States v. Randle*, 324 F.3d 550, 555 n.2, 556 n.3 (7th Cir. 2003)).

The government cites to one case, *United States v. Rutley*, 482 Fed. Appx. 175, 178-79 (7th Cir. 2012), to suggest that awarding restitution for interest on a loan is proper under the MVRA. *Id.* at 178-79 ("Restitution is calculated under 18 U.S.C. § 3663A and U.S.S.G. § 5E1.1, and those provisions do not exclude bargained-for interest [or finance charges] from a restitution award."). But *Rutley*'s approach—allowing restitution because the MVRA purportedly does not "exclude" interest as a basis for restitution—is foreclosed by the subsequent Supreme Court decision in *Lagos v. United States*, 584 U.S. 577 (2018).

As *Lagos* made clear, the MVRA permits restitution only for the specifically enumerated losses and expenses contained therein, not for more generalized concepts of potential loss:

> Congress has enacted many different restitution statutes with differing language, governing different circumstances. Some of those statutes specifically require restitution for the "full amount of the victim's losses," defined to include "any . . . losses suffered by the victim as a proximate result of the offense." *See* 18 U.S.C. §§ 2248(b), 2259(b), 2264(b), 2327(b). The Mandatory Victims Restitution Act, however, contains no such language; it specifically lists the kinds of losses and expenses that it covers.[175]

*Id.* at 583-84. As a consequence, it would be error for this Court to simply "interpret [the MVRA] in a way that favors an award." *Id.* at 583. Instead, the Court must determine whether the MVRA allows a particular loss to be included in a restitution order, which in turn requires consideration of "the statute's wording, both its individual words and the text taken as a whole." *Id.* at 581.

And again, because the MVRA permits reimbursement of lost income *only* for offenses resulting in bodily injury, not property offenses, the MVRA does not allow for recovery of lost profits, such as loan interest, in this case. *See, e.g., Mitchell*, 876 F.2d at 1183 ("Congress is clearly capable of authorizing restitution for lost income when it chooses to do so. Despite this fact, it has not included lost income in the type of restitution that may be ordered in property cases and, unless and until it

41

amends the statute to include lost income, courts may not order such restitution in property cases." (citation omitted)).

### C.    The Court Cannot Impose Restitution Pursuant to *Apprendi*

The government also failed to either charge in the Second Superseding Indictment or to prove to the jury beyond a reasonable doubt the facts about any victim's loss that would allow this Court to impose a restitution judgment against Rahul. This is critical, as the protections of the Sixth Amendment identified in *Apprendi* that preclude judicial factfinding that increases any maximum sentence, penalty, or punishment should apply in the restitution context as well. *See Southern Union*, 567 U.S. at 350 ("[W]e have never distinguished one form of punishment from another.").

Individual judges have agreed that *Apprendi* should preclude judges from finding the facts relating to victim loss in order to impose restitution. *See, e.g.*, *Hester v. United States*, 586 U.S. 1104, 1105-06 (2019) (Gorsuch, Sotomayor, J.J., dissenting from denial of certiorari) (arguing that *Apprendi* applies to restitution); *United States v. Leahy*, 438 F.3d 328, 339 (3d Cir. 2006) (en banc) (McKee, et al., J.J., concurring in part and dissenting in part) (same); *United States v. Carruth*, 418 F.3d 900, 905 (8th Cir. 2005) (Bye, J., dissenting) (same).

To be clear, this is not yet the law in the Seventh Circuit, which has rejected similar arguments. *United States v. Wolfe*, 701 F.3d 1206 (7th Cir. 2012); *United States v. Printz*, 594 F. App'x 883 (7th Cir. 2015). However, the Supreme Court recently heard oral argument in *Ellingburg v. United States*, No. 24-482, regarding whether restitution under the MVRA is penal for purposes of the Ex Post Facto Clause. The federal government has taken the position in *Ellingburg* that restitution is criminal and applying the MVRA retroactively is therefore unconstitutional. If *Ellingburg* results in an opinion that restitution is not a civil remedy, that would implicitly overrule Seventh Circuit precedent like *Wolfe* holding otherwise.

42

Accordingly, while recognizing the current state of the law in the Seventh Circuit, the Court should not impose restitution here in light of government's failure to allege in the Second Superseding Indictment or to obtain a jury finding regarding the facts necessary to determine restitution here.

## V. OBJECTIONS TO PRESENTENCING REPORT AND SENTENCING RECOMMENDATION

Rahul objects to the PSR's characterization (on pages 25-26) of his personal finances, as follows:

- The PSR triple-counts Rahul's N2N Technologies India stock, listing it under "BSE (stocks)" (BSE is the Bombay Stock Exchange), "N2N Technologies (1.7 million shares)," and "Business – N2N Technologies India." In reality, Rahul owns approximately $646,000 worth of stock in N2N Technologies India, and the PSR's error results in a $1.2 million overstatement of Rahul's total assets and net worth.

- The PSR erroneously states that Rahul owes only $15,000 on the 8918 Pottawattami Drive mortgage. That was the amount currently due at the time of the submission to the Probation Office. As Note E, on page 27 of the PSR, correctly observes, the full outstanding balance is approximately $130,000. This error results in a $115,000 understatement of Rahul's total liabilities and a $115,000 overstatement of Rahul's net worth.

- There are no longer any funds in the Fidelity Cash Management personal checking account.

- Accordingly, the PSR overstates Rahul's net worth by at least approximately $1,338,000.

43

- Moreover, without the PSR appears to add an additional approximately $1.5 million to Rahul's net worth without explanation; the Total Net Worth line on page 26 is not equal to Total Assets minus Total Liabilities.

The PSR misspells Rahul's father's name. PSR ¶ 82. Rahul's father was Dilip, not Dilib.

For the reasons stated in Section II.A.1 above, Rahul objects to the conclusion in the Sentencing Recommendation that the loss amount was $59,796,475.26. Sentencing Recommendation at 2.

Similarly, for the reasons stated in Sections II.A.1 and IV above, Rahul objects to the Sentencing Recommendation's statement that the amount of restitution owed is $59,796,475.26, and to the recommendation that he be ordered to make a partial lump sum payment of $1 million within 60 days of sentencing.

Rahul objects, for the reasons explained above in Section I.E, to the statement that "the nature of the defendant's health issues is not such that the Bureau of Prisons cannot provide adequate care for Mr. Shah." Sentencing Recommendation at 3.

## CONCLUSION

Rahul is a compassionate and generous person, who grew Katalyst from nothing, and personally received very little, if any, of the bank loan funds at issue in this case. For these reasons, and all the others set forth above, we respectfully urge the Court to impose a sentence of two years and two days' imprisonment.

Respectfully submitted,

/s/ Christopher S. Niewoehner

Christopher S. Niewoehner
STEPTOE LLP
227 West Monroe Street, Ste. 4700
Chicago, IL 60606
Telephone: (312) 577-1300
cniewoehner@steptoe.com

Drew C. Harris (*pro hac vice*)
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900
dcharris@steptoe.com

Caroline A. Covington (*pro hac vice*)
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-6269
ccovington@steptoe.com

## CERTIFICATE OF SERVICE

I, Christopher S. Niewoehner, an attorney, hereby certify that on December 15, 2025, I caused a true and correct copy of the foregoing submission to be served via the Court's ECF system upon all counsel of record.

/s/ Christopher S. Niewoehner
Christopher S. Niewoehner

45